TRAGER, District Judge,
concurring specially:
This case is quite troubling. What ultimately concerns me about this case is that it smacks of maintenance, if not champerty. Freemen, as an insider, held up to 89% of ATN’s debt on the bankruptcy fifing; he sought to use the WATS/ATN litigation to try to recoup his losses when his own business (WATS) failed. First, he made sure to buy the WATS/ATN lawsuit from the WATS Chapter 7 bankruptcy. Then, he used that litigation to take over ATN and, subsequently, when that endeav- or to save his financial fortunes also met no success, he decided to use litigation again as a tool to save himself from his poor business judgment, this time by going after the Allens who had previously sold their interests in ATN to Carpenter. Freemen was in no way defrauded; nor did he suffer any damage as a result of Carpenter’s buy-out of the Allens in January 1999. In fact, Freemen knew exactly what he was getting involved in when he agreed to take over ATN approximately eighteen months after Carpenter’s buy-out of the Allens. Moreover, he used the WATS/ATN claim not only to gain control of ATN, but also made sure to try to protect himself by receiving a security interest in all of ATN’s assets, as well as a $5.5 promissory note from Carpenter, acting on behalf of ATN. Significantly, Freemen received an affidavit from Carpenter declaring his insolvency in exchange for ATN’s forgiveness of Carpenter’s shareholder loans and $350,000 in salary and mortgage payments made to Carpenter. Freemen also made certain to purchase ATN’s claims against the Allens. That *1339 claim, along with Carpenter’s affidavit declaring insolvency, provided Freemen with a “get of out jail free” card. After operating ATN for almost three years after the ATN/WATS settlement, and with business still going badly, Freemen cashed that card in and filed the fraudulent transfer action a mere two days before the statute of limitations on that claim would have run. The bottom line is Freemen took a business risk and lost. He should not be allowed to use litigation as a hedge to protect himself from his calculated, and failed, business judgment. Unfortunately, this issue was never directly raised by the Allens.
In any event, I agree with the analysis of the majority until one gets to the valuation of the present value of the contingent liability of the WATS/ATN lawsuit as of June 1, 1999. Although I agree with the test employed, nevertheless, under the facts here, I believe that we have an answer at hand and, therefore, it is unnecessary to remand the issue of valuation of the contingent liability.
In January 1998, more than a year before the June 1999 transfer, WATS was willing to accept about $2 million in settlement for its $89 million claim against ATN.[1] WATS’ proffered settlement is the best evidence for what the liability was worth between December 28, 1998 and June 1, 1999, as nothing in the record indicates any change during that entire period and, accordingly, that claim is worth $2 million at most.[2] Using WATS’ willingness to settle for about $2 million is the most appropriate method of placing a value on this uncertain asset without engaging in speculation by paid and discredited experts.
Additionally corroborating this assessment is that there is no reference to the WATS litigation as a material contingent liability in the notes of ATN’s audited financial statements for year ending December 31, 1998. This tends to confirm that the value of the WATS litigation in January 1998 was worth, at the most, about $2 million dollars, and probably substantially less. While ATN’s attorney may have expressed concern about ATN’s exposure, the fact that WATS was willing to take about $2 million on a $39 million claim is far more compelling evidence of its value. Although this court cannot make findings of fact, the record here would not support a finding that the contingent liability was worth more than about $2 million, and I can see no new evidence coming to light to change that result. Thus, I do not believe it is necessary to remand the issue of valuation of the contingent liability.
Assuming that the shareholder loans were worth nothing and the WATS claim was worth about $2 million, the issue comes down to what the customer list was worth. The bankruptcy judge did not have to make a definitive finding of the value of the customer list in light of its analysis.[3] However, at this point it will be *1340 necessary for the court to do so. Accordingly, I think we should remand the case for the bankruptcy court solely for the purpose of making a definitive valuation of the customer list.[4]

. It is not completely clear whether the $3 million claim Investment Partners LLP ("IP”) held against ATN for conversion of their security interest in the customer list was included into the January 1998 $2 million settlement offer.

. The district court opinion denying ATN’s motion for summary judgment on the fraud claim occurred on September 30, 1999, four months after the June 1999 transfer.

. While the bankruptcy court found the $10.8 million valuation of the customer list proposed by the Allens' expert to be too high, it noted that all parties agreed that the customer list was equal to or greater than the $5.2 million mid-point proposed by ATN’s expert, and could be valued as high as $7.4 million. Thus, assuming the shareholder loans were worth nothing and the contingent liability is valued at about $2 million, the bankruptcy court need only find the customer list to be worth $6.6 million in order for ATN to be in positive territory.

. Based on IP’s original $3 million security interest in ATN's customer list and its agreement to settle its claims for $4.5 million, it is reasonable to assume that the customer list was worth at least $3-4.5 million, if not substantially more.